IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

RONALD T. REYNOLDS,
an individual,

                Plaintiff,

v.                                          CIVIL ACTION NO. 3:11-0202

UMWA HEALTH AND RETIREMENT
FUNDS, an Employee Pension Plan; and
DOES 1 through 10, inclusive,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are the parties' cross-motions for summary judgment. [Docs. 10 and 12] For the reasons that follow, the Court **GRANTS** the defendant's motion, [Doc. 10] and **DENIES** the plaintiff's motion. [Doc. 12]

**I.**    **Background and Procedural History**

This case arises from a denial of disability pension benefits. The plaintiff Ronald Reynolds ("Plaintiff") was a mining equipment operator who made contributions to pension funds managed by the defendant United Mine Workers Association ("UMWA" or "Defendant"). The material facts as established by the administrative record submitted to the Court for review are as follows.

Plaintiff began complaining of pain in his hips around January of 2001. R. at 134-35. He also had a history of anxiety and wheezing. R. at 134. From March to December of 2001, he saw various doctors for back and leg pain, depression, muscle spasms, and decreased neurological functioning. R. at 138-42. One of his primary treating physicians, Dr. Ronald Mann, noted on

-1-

August 16, 2001 that Plaintiff was, as a result of his pain, "able to work, but barely." R. at 140. Jim Tackett, a physician's assistant, reported in June of 2001 that Plaintiff was experiencing back pain on a daily basis, and had lost range of motion in his lumbar spine. R. at 138. Additionally, he noted that Plaintiff was suffering from bilateral tenderness in the paraspinal muscles, and that there was tenderness on palpitation bilaterally in the SI joints. R. at 138. During this period, Plaintiff did not have an MRI done because he ostensibly wanted to "continue to work." R. at 141.

On the night of December 13, 2001, Plaintiff was treated for injuries he received when he accidentally backed an end loader over a large lump of coal, which "severely jarred" him. R. at 144, 632. He was treated at the Pikeville Methodist Hospital emergency room for a headache, and neck and lower back pain. R. at 628. He was ultimately diagnosed with neck and lower back strain. R. 632-33. Coincidentally, Plaintiff came to Dr. Mann's office before this accident earlier on the same day. At this visit, Plaintiff reported that "his leg pain [was] actually worse . . . since his last visit." However, Plaintiff again declined to have an MRI done. Plaintiff was assessed with chronic lower back pain with a radicular component and muscle spasms. R. at 143.

Four days after his injury, Plaintiff saw Dr. Mann again. R. at 143. He reported neck pain and tingling in his left hand. R. at 142, 632. Dr. Mann stated that Plaintiff's "pain seem[ed] to be returned to his preinjury symptoms." He was nonetheless released to return to work. R. at 143.

Roughly one month later, on January 14, 2002, Plaintiff returned to Dr. Mann's office. At this visit, he reported pain and numbness in his left arm and hand, and stiffness in his neck. An examination revealed a decreased range of motion. Additionally, observations from this visit revealed that Plaintiff was turning his head and trunk as a unit, and had decreased ability to turn his head toward the left side. The assessment was neck pain, muscle spasm, chronic lower back pain

and radiculopathy. R. at 144.

Over the next few months, Plaintiff saw various medical personnel for his symptoms. R. at 145-47. However, his symptoms appeared to be relatively unchanged. *See, e.g.*, R. at 147 (noting that the patient continued to have many of the same complaints). Plaintiff's general medical assessments did not change sharply, but in March it was noted that he was suffering from radiculopathy in his lower extremities. R. at 146. Dr. Mann ordered x-rays which revealed no evidence of internal fractures or dislocation. R. at 478. Moreover, based upon examinations up to that point, it was again established that Plaintiff was suffering from chronic neck and lower back pain with radicular components. R. at 149.

On April 26, 2002, the West Virginia Workers' Compensation Division (the "Division") approved Plaintiff's claim for benefits based on the December 13, 2001 injury. The conditions listed by the Division as a basis for the award were neuralgia neuritis, lumbago, and cervicalgia. However, it stated that "we have no evidence which indicates that you have any permanent impairment resulting from this injury." The Division awarded benefits for necessary medical treatment and expenses because Plaintiff was "disabled from working less than four days." R. at 12.

On June 12, 2002, Dr. Mann finally ordered an MRI. R. at 151. The MRI result showed that Plaintiff's cervical spine was in alignment and that there was no evidence of disc herniation. There was, moreover, no evidence of significant degenerative disc disease, spinal stenosis, or vertebral body compression. R. at 157. Thereafter, he continued treatment for months during which time he reported many of the same symptoms. *See, e.g.*, R. at 157-69 (usual pain, numbness and tingling sensations in extremities).

Then, in April of 2003, Plaintiff was in an automobile accident while he was a passenger in

a car that was rear-ended.[1] He went to the emergency room after the accident, and reported neck pain with tingling radiating into his arms and worsening back pain radiating into his legs. Dr. Mann's treatment notes from May 2, 2003 state that Plaintiff's head propelled into the headrest, and there was evidence that he may have lost consciousness. Plaintiff was diagnosed with a concussion, post-traumatic cervical strain with headache and muscle spasm, and lumbar herniation with radicular pain. R. at 172. An MRI of Plaintiff's lumbar and cervical spines were relatively unremarkable with the exception of a showing of disc dehydration. R. at 173.

Months passed and Plaintiff's symptoms remained relatively unchanged. *See, e.g.*, 183-84, 205, 214 (post-accident injury assessments). In November of 2003, Plaintiff reported to Dr. John Gilbert. His comprehensive history noted that the timing of his pain was after a work injury *and* a motor vehicle accident. Plaintiff reported the severity of his pain as then an 8 out of 10. Dr. Gilbert's diagnosis concurred with Dr. Mann's earlier notes and he recommended epidural injections. R. at 201. Then, on December 12, 2003, another work accident report was filed stating that Plaintiff fell and landed on his buttocks when he was coming down steps and his hands slipped on the handrails. R. at 557. There is no significant medical history in the record from this accident.

In February of 2004, Plaintiff returned to Dr. Mann for follow up visits on his worker's compensation benefits. At these visits, he reported increased pain since the motor vehicle accident. Dr. Mann assessed lower back pain and neck pain. R. at 219-20. Plaintiff received epidural injections from Dr. Richard Lindgreen of the Spine & Brain Neurosurgical Center ("SBNC") on February 9 and March 8, 2004. R. at 228, 250. Dr. Lindgreen ultimately assumed primary control

---

[1] There seems to be minor confusion as to when the accident occurred. Plaintiff contends that it was in March or April of 2003. However, Dr. Mann's treatment notes indicate that it was on April 21, 2003. R. at 172.

of writing Plaintiff's pain prescriptions in April of 2004.[2] R. at 271. Plaintiff continued treatment, including more epidural injections, but his treatment did not significantly alleviate his increasing pain. *See, e.g.*, R. at 276.

Plaintiff's misfortunes continued. On September 15, 2004, he was in another automobile accident. This time, he was the driver of a vehicle that "[t]-boned another vehicle that crossed his path of travel." While there is no indication that he became unconscious, he reported confusion immediately following the accident. Dr. Mann diagnosed him with post-traumatic cervical and lumbar strain. R. at 312. MRIs performed on Plaintiff's cervical and lumbar spines a few weeks later showed "very minimal bulging of the L5-S1 disk with no evidence of a herniated nucleus pulposus or focal high grade stenosis at any visualized level." R. at 313. After reviewing the MRIs, Dr. Lingreen concluded that Plaintiff's cervical spine showed degenerative disc disease and the lumbar spine showed degenerative disc disease with "facet arthropathy." R. at 316.

From October to December of 2004, Plaintiff continued treatment with some improvement. *See, e.g.*, R. at 318, 320-25 (noting that Plaintiff received nerve blocks, more injections, and increased medication in light of his pain). In a note written by Dr. Mann on December 2, 2004, he stated that Plaintiff's treatment for car accident injuries indicated significant improvement. R. at 325.

Plaintiff suffered two other injuries during the period from October of 2004 to January of 2005. R. at 14, 336. On October 23, 2004, he ran an end-loader into a feeder grate, causing the machine to vibrate heavily. Because of the jarring, he broke a tooth and experienced pain in his

---

[2] Since early 2001, Plaintiff had been on a relatively steady dose of pain prescription medication—even before his December 13, 2001 mining accident. R. at 135-36, 271.

neck and lower back. R. at 14. On January 3, 2005, he received treatment for an accidental gunshot wound to his right arm he obtained from his wife while seemingly searching for a home intruder. R. at 534. *But see* 345-47 (alternatively suggesting that this event may have occurred during an altercation). Doctors at the University of Kentucky Hospital conducted reconstructive surgery on his left brachial artery. R. at 329-37. After surgery, he experienced numbness and tingling in his fingers, and some discomfort in his elbow. R. at 415. He was told by his attending physician that his radial nerve may never function as it used to. R. at 510.

Plaintiff saw various physicians for his usual symptoms over 2005 and 2006. *See, e.g.*, R. at 436, 451. In June of 2005, a pain patient profile conducted on Plaintiff concluded that he had "excessive somatic thought [which] may warrant the attention of a mental health professional" due to his pain history. R. at 444. Doctors at the SBNC continued to monitor his physical and mental health. R. at 451, 457. In April of 2006, an MRI revealed degenerative disc disease in the lumbar spine, facet arthropathy, and mild scoliosis. R. at 499. On this basis, Dr. Lingren again diagnosed him with degenerative disc disease. R. at 501. Dr. Mann continued to attribute Plaintiff's pain to his injuries, and noted that he had problems with anxiety and depression "secondary to [those] injuries." R. at 527.

From August of 2006 to April of 2007, Plaintiff had physical and mental Residual Functional Capacity Assessments ("RFCs") performed, along with various other psychological evaluations. *See, e.g.*, R. at 41-45, 50-52, 533. While the physical assessments noted no major neurological deficits, they did show that Plaintiff suffered from chronic lower back pain and degenerative disc disease. *See* R. at 110-12. Additionally, they showed that Plaintiff was limited in his ability to reach because of the gunshot wound, and that he could not climb ladders, ropes or scaffolds. R. at 43-45.

Plaintiff's mental evaluations suggested that he had problems with anxiety and stress due to various personal factors in his life. *See, e.g.*, R. at 533-34. On April 18, 2007, after one evaluation, Dr. Timothy Carbury concluded that Plaintiff had poor coping skills, and would have difficulty keeping his attention on tasks. Dr. Carbury's diagnostic impressions were as follows: Axis I anxiety disorder; Axis II diagnosis deferred; Axis III spinal column disease and gunshot trauma; and Axis IV medical and pain stressors, emotional, financial and social stressors.[3]  R. at 537.

On the basis of the findings in the RFCs and his symptoms, Plaintiff applied for Social Security Disability Insurance ("SSDI") benefits on May 9, 2006. R. at 28. An Administrative Law Judge ("ALJ") found that Plaintiff suffered from anxiety, depression, adjustment disorder and general pain. R. at 30. However, he concluded that these impairments were alone insufficient to warrant an SSDI award. Nonetheless, because of the RFCs and Plaintiff's personal characteristics, the ALJ determined that there were no significant jobs available for Plaintiff to perform, and awarded him benefits from December 19, 2004. R. at 32.

On January 22, 2008, Plaintiff filed an application for a disability pension with the Trustees of the UMWA 1974 Pension Plan (the "Plan" or "1974 Plan") based on his work-related injuries. *See* R. at 2; Def.'s Mem. Supp. Mot. Summ. J. Ex. A, No. 11 (hereinafter, the "Plan Document"). His application was denied by a nurse-reviewer on May 31, 2008. R. at 543-52. On appeal with newly submitted evidence—including a favorable independent medical evaluation ("IME") for a workers' compensation award performed by Dr. Anbu Nadar—the application was again denied on November 18, 2008. R. at 563. The Trustees essentially concluded that Plaintiff's impairments

---

[3] Since 2007, Plaintiff was also treated for his anxiety and depression at the Mountain Comprehensive Care Center ("MCCC").

were caused by pre-existing conditions and complicated by degenerative disc disease, and that other factors in his personal life caused his psychological problems. R. at 549-51. They relied in part on an interpretive guideline, Q & A 252, in arriving at a conclusion that progressive diseases are not caused by mining accidents. *See* Def.'s Mem. Supp. Mot. Summ. J. Ex. B, No. 11-3.

On July 24, 2009, Dr. Jason Stamper, a staff psychiatrist at MCCC, wrote a letter on Plaintiff's behalf, explaining his medical condition, and opining that the December 13, 2001 mining injury directly led to his physical and mental condition. R. at 639. Similarly, on September 23, 2009, Dr. Mann wrote a letter for Plaintiff concluding that "[h]e was not able to work due to complications from the December 13, 2001, compensable injury." R. at 692. Plaintiff submitted this new evidence for the Trustees' reconsideration in an attempt to show that there was in fact a causal link between the mining accident and his disability. However, the Trustees reviewed the information, and on November 3, 2010, concluded that it did not change the UMWA's position on his application. R. at 699.

## II.     Discussion

Plaintiff has brought the instant action challenging Defendant's decision to deny him a disability pension. The parties have filed cross-motions for summary judgment. To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court generally will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). In the

ERISA benefit-denial context, the record before the Court is generally the same record that was before the plan administrator, *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 82-83 (1st Cir. 2010), and "a motion for summary judgment is merely the conduit to bring the legal question [of benefit eligibility] before the . . . court." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999), *abrogated on other grounds by Abatie v. Alta Health and Life Ins. Co.*, 458 F.3d 955, 966-69 (9th Cir. 2006) (en banc).

### A. Standard of Review

The parties dispute the appropriate standard of review to apply. Generally, a plan administrator's benefits decisions are reviewed *de novo* unless the plan provides otherwise. *See Gilbert v. Med. Mut. of Ohio Co.*, 666 F. Supp. 2d 625, 632 (S.D. W. Va. 2009). In the event that the plan provides for discretionary review, an abuse-of-discretion standard instead applies. *Id.* A plan can confer discretion on its administrator "(1) by language which 'expressly creates discretionary authority,' and (2) by terms which 'create discretion by implication.'" *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 322 (4th Cir. 2008) (citing *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522-23 (4th Cir. 2000)). The Fourth Circuit has identified a list of non-exclusive factors to consider in determining whether an administrator abused its discretion:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir.

2000).

Here, the parties do not dispute that Article VIII(A) of the 1974 Plan Document expressly gives the Trustees of the UMWA full discretion to administer the plan and determine benefit eligibility for its members. *See* Plan Document, at 29. As the Fourth Circuit has found, Article VIII(A) "imparts broad discretionary authority to the 1974 Trustees." *Parsons v. Power Mountain Coal Co.*, 604 F.3d 177, 182 (4th Cir. 2010). Plaintiff, however, contends that the Trustees' discretionary authority is lessened by a conflict of interest due to their status as claims reviewer and plan benefits payer. *See Doe v. Group Hospitalization & Med. Svcs.*, 3 F.3d 80, 87 (4th Cir. 1993). A conflict of interest may exist where a plan administrator serves the dual role of evaluating claims for benefits and paying the claims. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105,106 (2008). Plaintiff intimates that the Trustees stood to benefit from denying Plaintiff's claim for disability benefits, and therefore, their decision should be more acutely scrutinized. The Court finds this argument unpersuasive.

Plaintiff relies on *Doe* in support of his argument. However, in *Doe*, the defendant-company both insured and administered the payment of healthcare benefits for the plaintiff's employer. *See* 3 F.3d at 85. The court reasoned there that the defendant's exercise of discretion had a direct financial impact on its profit from an underlying insurance contract with the employer inasmuch as it paid claims from the premiums it received. *Id.* at 86 ("To the extent that Blue Cross has discretion to avoid paying claims, it thereby promotes the potential for its own profit."). Trustees who serve as plan administrators of a defined benefit plan, however, do not necessarily have a conflict of interest in making decisions that accrue savings for the underlying *plan*:

> That plan administrators' decisions have had a favorable impact on the balance sheet of the trust itself . . . suggests no "conflict of interest."

> Fiduciaries are obligated to act not only in the best interests of beneficiaries, but with due regard for the preservation of trust assets. Adverse benefits determinations may well have saved considerable sums, but that may simply reflect that the trustees, bearing in mind the interests of *all* participants and beneficiaries, . . . made a considered decision to preserve the corpus of the trust, rather than grant a doubtful claim.

*See de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191 (4th Cir. 1989) (emphasis in original). In this case, as the UMWA points out, all expenses saved from denying improper benefit claims will simply remain in the trust for other eligible beneficiaries. Inasmuch as Plaintiff has offered no other evidence suggesting an actual or potential conflict, the Court finds that "[a] claimant's ineligibility for benefits would in no significant way serve the financial interests of the UMWA[]." *Hall v. Int'l Union*, No. 2:06-0973, 2007 U.S. Dist. LEXIS 56964, at *17 (S.D. W. Va. Aug. 2, 2007). Therefore, the Court applies an abuse of discretion standard with no consideration of any conflict of interest.

### B. The Plan and the Benefits Determination

Under Article II(D) of the Plan:

> Any Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 2002, shall, upon retirement . . . be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

Plan Document, at 5. Thus, in order to be eligible for disability pension benefits, a participant must show (1) that he was involved in a mine accident; (2) that he has been awarded SSDI benefits; and (3) that he was disabled as a result of the accident. *See Buzzard v. Holland*, 367 F.3d 263, 267-68 (4th Cir. 2004) (addressing comparable provision at Article II(C) (disability retirement)). Elements

one and two are not contested; Plaintiff was, in fact, involved in three qualifying mine accidents, and has been awarded SSDI benefits. The central dispute concerns the third element.

Plaintiff's application for a disability pension was denied on May 31, 2008. The Trustees determined that while Plaintiff was involved in three mining accidents and received SSDI benefits on the basis of a disability, R. at 544, 549-50 ("Mr. Reynolds was involved in several mine accidents that meet Plan requirements."), he had "not established that [his] disability was caused by a signatory mine accident as required by Article II of the 1974 Pension Plan." R. at 543. Plaintiff unsuccessfully appealed this denial. The Trustees affirmed the decision to deny benefits, R. at 562-63, even in light of an IME for a workers' compensation award done by Dr. Nadar, which concluded that Plaintiff was entitled to a 16% permanent partial disability award. R. at 579-80. The decision was affirmed on the grounds that the "evidence fail[ed] to show a causal relationship between the impairments that are the basis of Mr. Reynolds' [SSDI award] and a mining accident." R. at 563.

As a threshold matter, Plaintiff contends that the Trustees abused their discretion in relying on the progressive disease proviso in Q & A 252: "miners who become disabled by progressive diseases or conditions . . . cannot be considered 'disabled as a result of a mine accident.'" *See* Def.'s Mem. Supp. Mot. Summ. J. Ex. B, No. 11-3. He reasons that the Trustees may not rely on this provision because it is not "technically" part of the Plan itself. However, this argument is unavailing as the Fourth Circuit has on multiple occasions affirmed the Trustees' reliance on Q & A 252—and the interpretative guidelines in general—in determining benefit eligibility. *See McCoy v. Holland*, 364 F.3d 166, 170 (4th Cir. 2004) (discussing Q & A 252 and noting that the Trustees are afforded the same deference in applying Q & A's as they are given in interpreting the Plan); *cf. Richards v. UMWA Health & Retirement Fund*, 895 F.2d 133, 136-37 (4th Cir. 1990) (determining that the

Trustees abused their discretion by erroneously concluding that the progressive disease proviso in Q & A 252 should be read as an exception to a specific qualifying condition in the guideline). Morever, the Plan Document itself authorizes the Trustees to "promulgate rules and regulations" in implementing the Plan. *See* Plan Document, at 29 (Art. VIII(B)(1)). Plaintiff has offered no authority suggesting that the Trustees may not use external guidelines to guide their interpretation of the Plan, and under the abuse-of-discretion standard, a "plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"[4] *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).

When reviewing a claim, it is imperative that the court have before it the facts that were known to the administrator, and those facts which it relied upon, in making a benefit eligibility determination. *See Gilbert*, 666 F. Supp. 2d at 633 (positing that the application of the abuse-of-discretion standard depends in large part on a sound factual foundation). In analyzing the causation issue in the presence of other potential causes of an impairment—including degenerative disc disease—the Fourth Circuit has previously held that the Trustees must conduct a "proximate cause" inquiry. *See Robertson v. Connors*, 848 F.2d 472, 475 (4th Cir. 1998). Namely, "if the plaintiff was injured in a mine accident and that injury, whether in combination with a previous or subsequent condition, is *substantially responsible* for plaintiff's inability to perform his job . . . then his total disability results from a mine accident." *Id.* (emphasis added).

---

[4] The Court is somewhat puzzled as to why Plaintiff's counsel fails to acknowledge, much less distinguish, the significant authority within the Fourth Circuit permitting the Trustees to rely on Q & A 252. Counsel has a duty to inform the Court of all directly applicable case law. This requires counsel to adequately research matters of law and identify *all* controlling and important cases on a material issue—whether or not they are adverse to a client's position. Failing to do so raises doubts about counsel's diligence and credibility.

Here, the Trustees considered all of the material evidence in record, and reasonably concluded that a mining accident did not substantially contribute to Plaintiff's injuries. R. at 543. Rather, his impairments resulted from a combination of pre-existing pain, other accidents, and degenerative disc disease. R. at 543, 563. First, Plaintiff's medical records clearly indicate treatment for back pain with a radicular component, muscle spasms, and depression before the December 13, 2001 mining accident. *See, e.g.*, R. at 134 (January 16, 2001; diagnosing lower back pain with radicular component and anxiety disorder); R. at 138-39 (June 14, 2001; noting depression and pain rated at worst as a 9 out of 10); R. at 140 (August 16, 2001; noting that Plaintiff's back pain had increased since his last visit); R. at 141 (November 13, 2001; noting continuing back pain radiating into Plaintiff's legs); R. at 143 (December 13, 2001 (pre-injury); stating that Plaintiff reported increased leg pain since last visit). As the Trustees concluded, Plaintiff's treatment notes prior to December of 2001 showed serious back pain on almost a daily basis. R. at 560. There is a lack of evidence of significantly abnormal (or clinically different) findings subsequent to Plaintiff's mining injuries that would suggest that a mining accident was a substantial cause of his pain.

In addition, it was reasonable for the Trustees to find that Plaintiff suffered from degenerative disc disease due to his long history of working with heavy equipment. As noted, under Q & A 252, miners who suffer disability due to progressive diseases are not considered disabled as a result of a mining accident. Def.'s Mem. Supp. Mot. Summ. J. Ex. B, No. 11-3. Plaintiff's MRIs have shown degenerative disc disease on numerous occasions. *See, e.g.*, R. at 316 (noting that Plaintiff has "multi-level mild degenerative disc disease with facet arthropathy"); R. at 422 (noting "mild degenerative changes"). Plaintiff was also involved in three non-mining accidents that

seemed to contribute significantly to his symptoms. R. at 219-20, 312 (motor vehicle accidents); R. at 329-37 (gunshot wound). For instance, after his first motor vehicle collision, he reported neck pain and worsening back pain radiating into his legs. R. at 172. These symptoms continued for a considerable amount of time. *See* R. at 219.

Additionally, there is substantial evidence supporting the Trustees' determination that Plaintiff's anxiety, depression and adjustment problems were not caused by a mining accident. As already noted, Plaintiff was diagnosed with these conditions before the December 13, 2001 mining incident. *See* R. at 134. The Trustees also pointed out that there were "several other factors in his life that were not work related" which significantly contributed to his anxiety disorder. *See* R. at 551, 560. Dr. Carbury's psychological evaluation clearly supports this finding. *See* R. at 532-35. For example, Plaintiff had financial stressors that contributed to his emotional difficulty. R. at 534. In addition, Plaintiff was accidentally shot in the arm by his wife in 2005 while looking for an intruder who had been victimizing his neighborhood. R. at 345, 534. This intruder broke into Plaintiff's home on another occasion and was held by Plaintiff at gunpoint until police arrived. Plaintiff was reported to have "nervousness" and "anxious experience[s]" when recalling these events. R. at 534. The record thus supports the Trustees' findings on Plaintiff's psychological state.

Plaintiff points to letters written by Dr. Stamper and Dr. Mann, which both seem to conclude that his impairments were caused in large part as a result of the December 13, 2001 mining incident. R. at 639, 692. These letters, however, do not alter the greater weight of the evidence. First, Dr. Stamper's letter is a cursory assessment of Plaintiff's entire medical history. He stated that Plaintiff's physical and mental problems were directly related to the December 13, 2001 mining accident, but he does not at all discuss the significant treatment Plaintiff received and the pain he

experienced *before* that event.[5] R. at 639. Dr. Mann's letter, which states that Plaintiff was unable to work "due to complications from the December 13, 2001, compensable injury," is also unpersuasive inasmuch as it is conclusory, and contradicts his prior treatment notes. *Compare* R. at 692 (suggesting that Plaintiff's disability was caused by a mining accident) *with* R. at 134-42 (noting that Plaintiff suffered from significant back pain and anxiety problems in early to late 2001).

Nor does the Court find dispositive Dr. Nadar's recommendation that Plaintiff receive a 16% permanent workers' compensation award in light of his work injury. While such an award may provide evidence of a disability, the Trustees need not determine it to be conclusive proof. *See Hale v. Trustees of the UMWA Health & Retirement Funds*, 23 F.3d 899, 902 (4th Cir. 1994). As the UMWA points out, Plaintiff's initial determination of workers' compensation benefits—which occurred after the first mining accident—found no evidence of permanent injury. R. at 12. Dr. Nadar's evaluation occurred in 2008 after the interim car accidents, and is not entirely exhaustive of Plaintiff's medical history. R. at 579. The Trustees could have reasonably concluded based on the totality of this evidence that the workers' compensation award was not entitled to significant weight.

Finally, to the extent that Plaintiff suggests that the Trustees improperly relied upon nurse case reviewers' opinions, the Court rejects that contention. "[I]t is common for administrators to rely upon the opinions of non-examining, independent medical professionals in the benefits determination process." *Gillespie v. CUNA Mut. Group Long Term Disability Ins. Policy*, No. 2:09-cv-0120, 2010 U.S. Dist. LEXIS 50254, at *26 (S.D. W. Va. May 21, 2010). The records provided

---

[5] As a general matter, Dr. Stamper is a psychiatrist, and his opinion as to the cause of Plaintiff's physical injuries is not entitled to substantial weight.

by Plaintiff's own doctors more than adequately support the Trustees' decision.

On balance, Plaintiff has not shown that the Trustees' determination was not supported by substantial evidence under the *Booth* factors. "[A] reviewing court will not disturb a decision if it is 'the result of a deliberate and principled reasoning process and is supported by substantial evidence.'" *Gilbert*, 666 F. Supp. 2d at 633 (quoting *Evans v. Metro. Life Ins. Co.*, 358 F.3d 307, 310-11 (4th Cir. 2004)). This is true despite the fact that the court could potentially come to a decision different than that of the plan administrator in a *de novo* context.

### III. Conclusion

For these reasons, the Court **GRANTS** the defendant's motion for summary judgment, [Doc. 10] and **DENIES** the plaintiff's motion for summary judgment. [Doc. 12] Accordingly, the Court **DISMISSES** this action from the docket.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: August 29, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE